FILED

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
### ALEXANDRIA DIVISION

2014 SEP 17 P 2: 56

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

| | |
|---|---|
| CITY OF HALLANDALE BEACH POLICE OFFICERS' AND FIREFIGHTERS' PERSONNEL RETIREMENT TRUST, on behalf of itself and all others similarly situated, | Civ. A. No. 1: 14cv1227 AJT IDD |
| Plaintiff, | CLASS ACTION |
| v. | COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| LUMBER LIQUIDATORS HOLDINGS, INC., ROBERT M. LYNCH, and DANIEL E. TERRELL, | JURY TRIAL DEMANDED |
| Defendants. | |

City of Hallandale Beach Police Officers' and Firefighters' Personnel Retirement Trust ("Plaintiff"), by and through its counsel, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, *inter alia*, counsel's investigation, which includes review and analysis of: (a) regulatory filings made by Lumber Liquidators Holdings, Inc. ("Lumber Liquidators" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (b) press releases and media reports issued by and disseminated by the Company; (c) analyst reports concerning Lumber Liquidators; (d) government regulatory reports regarding the Company; and (e) other public information regarding the Company.

## INTRODUCTION

1.      This class action is brought on behalf of purchasers of Lumber Liquidators' publicly traded common stock between November 25, 2013 and July 9, 2014, inclusive (the "Class Period"). The claims asserted herein are alleged against Lumber Liquidators and certain of the Company's senior executives (collectively, "Defendants"), and arise under Sections 10(b)

and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2.      Headquartered in Toano, Virginia, Lumber Liquidators is one of the largest retailers of hardwood flooring in North America. The Company prides itself on its "commitment to in-stock inventory levels" and a "focused supply chain" that allow it to consistently meet customers' expectations.

3.      Throughout the Class Period, the Company repeatedly assured investors that its network of wood flooring suppliers was diversified and could provide Lumber Liquidators with sufficient inventory to meet customer demand, without having a negative impact on revenue, earnings, or margins.  In addition, Lumber Liquidators continually touted that its sourcing initiatives would continue to drive revenue and earnings growth and margin expansion.  As a result of these misrepresentations, Lumber Liquidators stock traded at artificially inflated prices during the Class Period.

4.      The truth was revealed on July 9, 2014, when the Company announced poor financial results, which it attributed to lower than planned inventory levels.  Contrary to prior assurances, Lumber Liquidators' supplier network did not include enough lumber mills to provide sufficient inventory.  Lumber Liquidators also revealed that heavy discounting during the Class Period caused margins to contract in the second quarter compared to the same quarter in 2013.

5.      On this news, the Company's stock price plummeted $15.17, or 21.5%, wiping out over $400 million of market value.  The decline in the price of Lumber Liquidators stock caused by these disclosures of the truth about the Company damaged Plaintiff and the Class.

## JURISDICTION AND VENUE

6.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.P.R. § 240.10b-5. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

7.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b). Lumber Liquidators maintains its executive offices in this District and many of the acts and conduct that constitute the violations of law complained of herein, including dissemination to the public of materially false and misleading information, occurred in and/or were issued from this District. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

8.     City of Hallandale Beach Police Officers' and Firefighters' Personnel Retirement Trust is a pension fund based in Hallandale, Florida that provides retirement benefits for retired police officers and firefighters. As of December 31, 2013, Plaintiff managed assets in excess of $127 million on behalf of hundreds of active members, retirees, and beneficiaries. Plaintiff purchased shares of Lumber Liquidators stock on the New York Stock Exchange during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

9.     Defendant Lumber Liquidators, a Delaware corporation based in Virginia, is a hardwood flooring distributer and retailer. Lumber Liquidators maintains its principal executive

offices at 3000 John Deere Road, Toano, Virginia. The Company's common stock trades on the New York Stock Exchange, which is an efficient market, under ticker symbol "LL." Lumber Liquidators currently has approximately 27.4 million shares of stock outstanding.

10.     Defendant Robert M. Lynch ("Lynch") was, at all relevant times during the Class Period, Lumber Liquidators' President and Chief Executive Officer ("CEO").

11.     Defendant Daniel E. Terrell ("Terrell") was, at all relevant times during the Class Period, Lumber Liquidators' Chief Financial Officer ("CFO").

12.     Defendants Lynch and Terrell are collectively referred to hereinafter as the "Individual Defendants." The Individual Defendants, because of their positions with Lumber Liquidators, possessed the power and authority to control the contents of Lumber Liquidators' reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors. Each of the Individual Defendants was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.

## BACKGROUND

13.     Founded in 1994, Lumber Liquidators is one of the largest retailers of hardwood flooring in North America. The Company prides itself on its "commitment to in-stock inventory levels" and a "focused supply chain," which allow it to consistently meet customer demand.

4

14.     To bolster its supply chain and the availability of wood flooring inventory, in 2011, Lumber Liquidators began an initiative to cut out middleman suppliers and source wood flooring products direct from mills in China.  The Company referred to these strategies as its "sourcing initiatives."

15.     Throughout the Class Period, the Company assured investors that its extensive and diverse supplier network would provide Lumber Liquidators with sufficient inventory to meet customer demand.  In addition, the Company touted that its sourcing initiatives would continue to drive revenue and earnings growth and margin expansion.

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS CAUSE SUBSTANTIAL LOSSES TO INVESTORS

16.     On November 25, 2013, the first day of the Class Period, *The Wall Street Journal* reported that Lumber Liquidators issued a statement, in which the Company assured investors that because it sources wood from a large and diverse group of mills, any suppliers that do not comply with the Company's quality assurance standards could be replaced with different suppliers without affecting Lumber Liquidators' ability to meet customer demand.  Specifically, the Company stated that it "diversif[ies] our sourcing across more than 100 suppliers, which affords us the flexibility to make changes to meet consumer trends and move business away from any supplier unwilling to comply with our policies."  Lumber Liquidators also represented "that no single mill provides more than 4% of our hardwood purchases and no single hardwood product represents more than 1% of our sales mix."

17.     The statements set forth above in ¶16 were materially false and misleading because Defendants knew or should have known that a significant number of mills would not be able to satisfy the Company's quality assurance requirements, resulting in insufficient availability of inventory.  In addition, Defendants knew or should have known that, as a result of

these inventory constraints and supply chain problems, the Company's sales force would be forced to offer higher discounts on alternative merchandise, which would erode margins.

18.     On December 9, 2013, the Company issued a press release updating its business outlook for 2013 and 2014. In the release, which was also filed with the SEC on Form 8-K, the Company stated 2014 revenue guidance of "$1.15 billion to $1.20 billion," based on revenue growth of "high single to low-double digits." Lumber Liquidators also provided earnings guidance for 2014 "in the range of approximately $3.25 to $3.60" per share.

19.     The statements set forth above in ¶18 were materially false and misleading because Defendants knew or should have known that a significant number of mills would not be able to satisfy the Company's quality assurance requirements, resulting in insufficient availability of inventory. In addition, Defendants knew or should have known that, as a result of these inventory constraints and supply chain problems, the Company's sales force would be forced to offer higher discounts on alternative merchandise, which would erode margins.

20.     The following day, the Company presented at the Credit Suisse Hardline Retail Roundup investor conference. During the presentation, the Company touted that, despite its strict quality control policies, gross margins would continue to grow through retail price discipline—*i.e.*, minimal discounting—and the sourcing initiatives. Specifically, the Company's presentation stated that investors could anticipate "[c]ontinued gross margin expansion from . . . retail price discipline and sourcing initiatives." The Company also stated that it "[e]xpect[s] to continue [its] sourcing strategy of direct sourcing with international and domestic mills to control product cost and quality, enhance forecasting and broaden [its] product assortment." In addition, Lumber Liquidators touted its "[s]trong relationships with more than 150 domestic and

international vendors" and reiterated that no single supplier accounts for more than 4% of hardwood purchases.

21. The statements set forth above in ¶20 were materially false and misleading because Defendants knew or should have known that a significant number of mills would not be able to satisfy the Company's quality assurance requirements, resulting in insufficient availability of inventory. In addition, Defendants knew or should have known that, as a result of these inventory constraints and supply chain problems, the Company's sales force would be forced to offer higher discounts on alternative merchandise, which would erode margins.

22. On February 19, 2014, the Company issued a press release announcing its financial results for its fourth quarter ended December 31, 2013. In the press release, which was also filed with the SEC on Form 8-K, Lumber Liquidators reaffirmed 2014 revenue guidance of "$1.15 billion to $1.20 billion" and earnings of "$3.25 to $3.60" per share.

23. On February 19, 2014, the Company also held an earnings conference call, during which CEO Lynch continued to assure investors of the flexibility and diversity of the Company's supply chain. Specifically, Lynch stated that the Company's "direct sourcing model is intact, and our diversified sourcing across more than 150 suppliers will continue to afford us the flexibility to add or remove vendors quickly, seamlessly, and appropriately, as needed." Lynch also stated that during the quarter, stores had "less need to discount and could firm up on their pricing disciplines."

24. Also on February 19, 2014, the Company filed its annual report on Form 10-K for the fiscal year ended December 31, 2013. In the annual report, Lumber Liquidators touted that a key component of its "value proposition" is the availability of inventory. Specifically, the Company stated:

> *Availability.* Our commitment to in-stock inventory levels and our
> focused supply chain allow our entire assortment to be available to
> meet our customers' expectations in a manner which we believe is
> more timely than our competitors.

25.     In the annual report, Lumber Liquidators continued to tout the strength and

diversity of its supplier network.  Specifically, the Company stated that it "ha[s] diversified our

purchases across approximately 150 domestic and international mills." Lumber Liquidators also

reiterated that it maintains a diverse network of suppliers and that it does not rely heavily on any

one supplier. In particular, the Company stated:

> [O]ur top 20 suppliers accounted for approximately 64% of our
> supply purchases in 2013.  We are well diversified, however, with
> our largest mill partner representing approximately 10% of our
> supply purchases in 2013 and our largest hardwood provider
> representing approximately 6%.

26.     The statements set forth above in ¶¶22-25 were materially false and misleading

because Defendants knew or should have known that a significant number of mills would not be

able to satisfy the Company's quality assurance requirements, resulting in insufficient

availability of inventory. In addition, Defendants knew or should have known that, as a result of

these inventory constraints and supply chain problems, the Company's sales force would be

forced to offer higher discounts on alternative merchandise, which would erode margins.

27.     Two days later, on February 21, 2014, Defendant Lynch sold 75,121 shares of his

personally-held Lumber Liquidators stock at an average price of about $103.11 per share,

resulting in proceeds of about $7.7 million.

28.     On April 30, 2014, the Company issued a press release announcing its financial

results for its first quarter ended March 31, 2014.  In the press release, which was filed with the

SEC on Form 8-K, the Company announced disappointing financial results, including lower than

expected margin growth, for the first quarter of 2014. Lumber Liquidators attributed its poor margin growth primarily to "severe winter weather."

29.     Despite the poor quarterly results, during a conference call held later that same day, the Company reaffirmed its previously announced revenue and earnings guidance for 2014. Specifically, Defendant Terrell stated that "[w]e continue to expect net sales for the full year in the range of $1.15 billion to $1.2 billion" and "operating margin expansion in the range of 13% to 13.8%, resulting in 2014 earnings per diluted share in the range of $3.25 to $3.60."

30.     During the conference call, Defendant Lynch also assured investors that the Company's supplier network remained strong and was more than capable of providing sufficient inventory to meet demand. Specifically, Lynch stated that "the initiatives we have implemented over the last three years have our stores and supporting operations prepared to fully capture available customer demand." Lynch reiterated that "[a]s a result, our outlook for the full year remains intact."

31.     Although the Company's assurances assuaged analysts' concerns over the worse-than-expected quarter, during the conference call, at least one analyst questioned whether there was "something abnormal in the quarter, maybe outside of weather, that impacted" the Company's financial results. In response, Defendant Terrell assured investors that investors should expect continued margin growth "from each one of the product margin drivers" including "lower product cost through the sourcing initiatives, or [price] discipline."

32.     The statements set forth above in ¶¶28-31 were materially false and misleading because Defendants knew or should have known that a significant number of mills would not be able to satisfy the Company's quality assurance requirements, resulting in insufficient availability of inventory. In addition, Defendants knew or should have known that, as a result of

these inventory constraints and supply chain problems, the Company's sales force would be forced to offer higher discounts on alternative merchandise, which would erode margins.

**Lumber Liquidators Discloses The Truth About Its Supply Chain Issues**

33.     On July 9, 2014, after the market closed, the Company shocked investors by announcing that its second quarter revenues would miss estimates by over 13% while earnings would be 30% below expectations. In the press release, which was filed with the SEC on Form 8-K, the Company attributed its dismal financial results to "lower than planned inventory levels" stemming from "production delays in meeting . . . open orders as [they] continued to enhance . . . quality assurance requirements."   In other words, contrary to prior assurances, Lumber Liquidators was not able to "add or remove vendors . . . as needed" to meet demand for its wood flooring products.

34.     Despite the Company's representations about "price discipline," Lumber Liquidators also disclosed that heavy discounting during the Class Period caused margins to contract in the second quarter compared to the same quarter in 2013. The Company revealed that its sales force was forced to offer higher discounts as a result of the inventory constraints and supply chain problems.

35.     Following these disclosures, the Company's stock price fell $15.17 per share, or 21.5%, to close at $55.25 per share on July 10, 2014.

36.     These disclosures baffled analysts, who had been led to expect the Company's sourcing and price discipline initiatives would continue to drive revenue and earnings growth despite the Company's quality assurance standards. For example, analysts at KeyBanc Capital Markets were stunned by the Company's "surprisingly poor 2Q results and lowered guidance . . . especially with numerous initiatives in place to drive share gains."

37.    In addition, analysts at Jeffries Group reported that the Company and its senior executives admitted to knowing about the supply chain issues "but underestimated the magnitude of the problem when considered in aggregate."

## LOSS CAUSATION

38.    During the Class Period, as detailed herein, Defendants made materially false and misleading statements and omissions, and engaged in a scheme to deceive the market. This artificially inflated the price of Lumber Liquidators common stock and operated as a fraud or deceit on the Class. Later, when Defendants' prior misrepresentations and fraudulent conduct were disclosed to the market on July 9, 2014, the price of Lumber Liquidators common stock fell precipitously, as the prior artificial inflation came out of the price over time. As a result of their purchases of Lumber Liquidators common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## CLASS ACTION ALLEGATIONS

39.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased the common stock of Lumber Liquidators during the Class Period (the "Class"). Excluded from the Class are Defendants and their families, directors, and officers of Lumber Liquidators and their families and affiliates.

40.    The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. Lumber Liquidators has approximately 27.4 million shares of common stock outstanding, owned by hundreds or thousands of investors.

41.     There is a well-defined community of interests in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

    (a)     Whether Defendants violated the Exchange Act;

    (b)     Whether Defendants omitted and/or misrepresented material facts;

    (c)     Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

    (d)     Whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

    (e)     Whether the price of Lumber Liquidators common stock was artificially inflated;

    (f)     Whether Defendants' conduct caused the members of the Class to sustain damages; and

    (g)     The extent of damage sustained by Class members and the appropriate measure of damages.

42.     Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

43.     Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

44.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## INAPPLICABILITY OF STATUTORY SAFE HARBOR

45.     Lumber Liquidators' "Safe Harbor" warnings accompanying its forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.

46.     Defendants are also liable for any false or misleading forward-looking statements pleaded herein because, at the time each such statement was made, the speaker knew the statement was false or misleading and the statement was authorized and/or approved by an executive officer of Lumber Liquidators who knew that the statement was false. None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## PRESUMPTION OF RELIANCE

47.     At all relevant times, the market for Lumber Liquidators' common stock was an efficient market for the following reasons, among others:

(a)     Lumber Liquidators stock met the requirements for listing, and was listed and actively traded on the New York Stock Exchange, a highly efficient and automated market;

(b)     As a regulated issuer, Lumber Liquidators filed periodic public reports with the SEC and the New York Stock Exchange;

(c)     Lumber Liquidators regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of

press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

        (d)    Lumber Liquidators was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s). Each of these reports was publicly available and entered the public marketplace.

48.    As a result of the foregoing, the market for Lumber Liquidators securities promptly digested current information regarding Lumber Liquidators from all publicly available sources and reflected such information in the price of Lumber Liquidators stock. Under these circumstances, all purchasers of Lumber Liquidators common stock during the Class Period suffered similar injury through their purchase of Lumber Liquidators common stock at artificially inflated prices and the presumption of reliance applies.

49.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class' claims are grounded on Defendants' material omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's decelerating revenue growth—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of Lumber Liquidators' ability to source wood flooring products through its network of lumber mills, as set forth above, that requirement is satisfied here.

## COUNT I

### For Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants

50.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

51.     During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Lumber Liquidators common stock at artificially inflated prices.

52.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Lumber Liquidators common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

53.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations, and prospects.

54.     During the Class Period, Defendants made the false statements specified above, which they knew or recklessly disregarded to be false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

55. Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them. Defendants engaged in this misconduct to conceal Lumber Liquidators' true condition from the investing public and to support the artificially inflated prices of the Company's common stock.

56. Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Lumber Liquidators common stock. Plaintiff and the Class would not have purchased the Company's common stock at the prices they paid, or at all, had they been aware that the market prices for Lumber Liquidators common stock had been artificially inflated by Defendants' fraudulent course of conduct.

57. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases of the Company's common stock during the Class Period.

58. By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

**For Violation of Section 20(a) of the Exchange Act against the Individual Defendants**

59. Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

60. The Individual Defendants acted as controlling persons of Lumber Liquidators within the meaning of Section 20(a) of the Exchange Act. By virtue of their high-level positions, participation in and/or awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance, and their power to control public statements about Lumber Liquidators, the

16

Individual Defendants had the power and ability to control the actions of Lumber Liquidators and its employees.  By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.     Awarding compensatory damages in favor of Plaintiff and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D.     Awarding such equitable/injunctive or other further relief as the Court may deem just and proper.

### JURY DEMAND

Plaintiff demands a trial by jury.

DATED: September 17, 2014

Respectfully Submitted,

Susan R. Podolsky (Va. Bar No. 27891)
**LAW OFFICES OF SUSAN R. PODOLSKY**
1800 Diagonal Road, Suite 600
Alexandria, Virginia 22314
Telephone: (571)366-1702
Facsimile: (703) 647-6009
spodolsky@podolskylaw.com

*Local Counsel for Plaintiff City of Hallandale Beach Police Officers' and Firefighters' Personnel Retirement Trust*

17

Gerald H. Silk (*pro hac vice* motion to be filed)
Avi Josefson (*pro hac vice* motion to be filed)
**BERNSTEIN LITOWITZ BERGER
   & GROSSMANN LLP**
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 554 1400
Facsimile:  (212) 554 1444
jerry@blbglaw.com
avi@blbglaw.com

*Counsel for Plaintiff City of Hallandale Beach
Police Officers' and Firefighters' Personnel
Retirement Trust*